IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Bank of the Eastern Shore | : : : : | |
| v. | : | Case No. CCB-12-2111 |
| KAREN V. ABBOTT, *et al.* | : : : | |

## **MEMORANDUM**

This case was originally filed in state court by the Bank of the Eastern Shore as an action for a confession of judgment against defendants Karen Abbott and Maurice Jay Robinson. The bank alleged that Abbott and Robinson defaulted on approximately $100,000 in joint loans, and it received an Order of Confessed Judgment on June 13, 2011. After the bank began garnishing Abbott's wages in October 2011, she filed a motion to vacate the judgment in state court, but not until June 29, 2012. During this time, the bank went into receivership and the Federal Deposit Insurance Corporation ("FDIC") was substituted as the plaintiff in this case, which it removed from the Circuit Court for Dorchester County to federal court on July 16, 2012. After a stay to permit exhaustion of her claims with the FDIC, Abbott subsequently filed counterclaims against the FDIC as receiver, a third party complaint against Robinson and employees and former employees of the bank, and a motion to join all of her claims.[1] The FDIC has moved to dismiss Abbott's counterclaims for lack of subject matter jurisdiction. For the reasons stated below, Abbott's motion to vacate the confessed judgment will be denied, the FDIC's motion to dismiss

---

[1] This case was administratively closed pending Abbott's exhaustion of her claims, (ECF No. 23), but it should have been reopened after Abbott filed her counterclaims in January 2013. The court will reopen the case in its order on the pending motions.

her counterclaims will be granted in part and denied in part, and her motion for joinder of her third party claims will be granted.

## BACKGROUND

According to Abbott, she and Robinson lived together for six years, between 2003 and 2009. Robinson moved out of the residence in 2009, but he had a key until September or October 2011.[2] (Abbott Aff., ECF No. 16-1, ¶ 2; Counter Compl., ECF No. 26, ¶¶ 11-12). In 2003 and 2004, Abbott opened several accounts at the bank, in part at the suggestion of Robinson, whose sister, Suzanne Richardson, was an employee of the bank. (Counter Compl. ¶¶ 15-21). Abbott maintains that she never opened any other account or entered into any other transaction with the bank. In fact, she alleges she had never physically entered the bank at all prior to its garnishing her wages, because Robinson and his sister had helped her open her checking and savings accounts at the bank. (*Id.*; Abbott Aff. ¶ 7).

In her motion to vacate and in her counter complaint, Abbott alleges that she was never aware of any loans taken out at the bank in her name and that Robinson, acting in concert with his sister and possibly other bank employees, forged her signature on loan documents. After investigating bank records, Abbott discovered that nine loans had been taken out in her name, all with documents she claims contain forged signatures. (Counter Compl. ¶¶ 23-64). When Abbott confronted Robinson about the loans, after she discovered her wages were being garnished because several of the loans were in default, he told her "it wasn't supposed to happen this way" and that "he would reimburse [her] for every penny that was missing from [her] accounts." (Abbott Aff. ¶ 9). Abbott retained counsel and began pursuing remedies for the alleged fraud. In her investigation of the fraudulent loans, Abbott also discovered that funds had been transferred

---

[2] While the affidavit attached to Abbott's motion to vacate lists October 2011 as the date until which Robinson had a key, her counter complaint lists September 2011.

out of her accounts at the bank without her knowledge. (*See, e.g.*, Counter Compl. ¶¶ 31-35, 46, 86-87). In her counter complaint, Abbott alleges that the bank is liable for breach of contract, negligence, conversion, negligent supervision, and, under respondeat superior, for the actions of several bank employees. In her third party complaint, Abbott brings claims of breach of contract, conversion, negligence, fraud, and conspiracy against Robinson, his sister, and other employees and former employees of the bank.

## ANALYSIS

### I. Motion to Vacate the Confessed Judgment

A confessed judgment is a procedural mechanism in Maryland state court for obtaining an accelerated judgment, in a liquidated amount, based on a written instrument containing a provision authorizing a confession of judgment. *See* Maryland Rule 2-611. The statute provides that a defendant will have the same amount of time Maryland law provides for an answer to a complaint to file a motion to vacate a confessed judgment, once the defendant is served notice of its entry. *See* Rule 2-611(d); Rule 2-321(a). Because Abbott states she did not discover the judgment until her wages were being garnished, after the period to file such a motion had elapsed under Maryland's statutory 30-day review period for judgments, she moves to vacate the confessed judgment against her under Maryland Rule 2-535(b), which states that, "[o]n motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity." Abbott argues that Robinson and his co-conspirators' fraudulent use of her signature in obtaining the loans on which the judgments were entered is grounds for vacating the bank's judgment against her.

"Maryland cases are legion that recognize the principle that there must be a definite and foreseeable end to litigation, and that ordinarily judgments should not be vacated after the

3

passage of the 30-day review period." *Bland v. Hammond*, 935 A.2d 457, 461-62 (Md. App. 2007) (citing *Fleisher v. Fleisher Co.*, 483 A.2d 1312, 1313 (Md. App. 1984)). The terms "fraud," mistake," and "irregularity" have been "narrowly defined and strictly applied." *Autobahn Motors, Inc. v. Baltimore*, 583 A.2d 731, 733 (Md. 1991). "Only extrinsic fraud will justify the reopening of an enrolled judgment; fraud which is intrinsic to the trial itself will not suffice." *Bland*, 935 A.2d at 463; *see also Hamilos v. Hamilos*, 465 A.2d 445, 449 (Md. 1983); *Fleisher*, 483 A.2d at 1315. "In determining whether extrinsic fraud exists, 'the question is not whether the fraud operated to cause the trier of fact to reach an unjust conclusion, but whether the fraud prevented the actual dispute from being submitted to the fact finder at all.'" *Bland*, 935 A.2d at 463 (quoting *Hresko v. Hresko*, 574 A.2d 24, 26-27 (Md. App. 1990)). For example, "an enrolled decree will not be vacated even though obtained by the use of forged documents, perjured testimony, or any other frauds which are 'intrinsic' to the trial of the case itself." *Schwartz v. Merchants Mortg. Co.*, 322 A.2d 544, 546 (Md. 1974). On the other hand, "[w]here the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him *by his opponent*, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts *of the plaintiff*; . . . a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing." *Bland*, 935 A.2d at 463-64 (quoting *United States v. Throckmorton*, 98 U.S. 61, 65-66 (1878) (emphasis added)).

Here, Abbott argues that the "use of the . . . forged documents to secure a judgment against [her]" constituted extrinsic fraud and is grounds to vacate the confessed judgment against her. (Def.'s Reply, Mot. Vacate, ECF No. 35-1, at 2-3). But, under Maryland law, the bank properly served Abbott by delivering notice of the confessed judgment to her residence through a

process server and leaving it with Robinson on June 27, 2011, who was there at eleven in the morning on a Monday. *See* Maryland Rule 2-121(a)(2) (providing that service may be made within the state by, amongst other methods, "leaving a copy of the summons, complaint, and all other papers filed with it at the individual's dwelling house or usual place of abode with a resident of suitable age and discretion"); Rule 2-611(c) (stating that notice of confessed judgment "shall be served on the defendant in accordance with Rule 2-121"). The server had also attempted to serve Abbott at home on the evening of June 22. (ECF No. 4). Although Abbott states that Robinson was no longer living with her when he was served, he had lived with her at that house for six years, he had a key to the house until at least September 2011, and he was home when the process server arrived at her house on that morning. Notably, although Robinson was served by the bank at a different address, his notice of confessed judgment was left by the process server with Robinson's mother at the other address. (ECF No. 6). Abbott suggests that service was nonetheless improper or fraudulent because Robinson was perpetrating the fraud against her and, therefore, the bank should not have permitted him to be served with her notice, even at her own home. While, in light of the broader allegations in this case, it may have been very unfortunate that notice of the judgment was served on Robinson, who may have intentionally kept the judgment hidden from Abbott, there is not a plausible basis to find that the bank, as plaintiff in the action for confessed judgment, had any role in keeping the notice from Abbott or otherwise took any action or perpetrated any fraud to prevent her from challenging the confessed judgment. To the contrary, the bank diligently and appropriately served notice.

Abbott's allegations that Robinson's sister and other bank employees took part in the fraud, even if proven true, are not a basis to conclude that the bank attempted to keep Abbott out of court through any fraud. As the action for confessed judgment demonstrates, the bank itself

5

lost considerable assets in the allegedly fraudulent loans. To the extent anyone may be liable for fraudulently preventing Abbott from challenging the judgment, it would seem that Robinson and his alleged co-conspirators are responsible, not the bank itself.

Two of the rare cases in which Maryland courts have found the requisite extrinsic fraud to vacate a judgment are instructive. First, in *Fleisher*, the plaintiff executed actions for confessed judgment against a corporation for his own benefit, and he accepted service on behalf of the defendant corporation as its agent, while an interested attorney made filings in the circuit court "on behalf of the plaintiffs . . . and decided on behalf of the defendant corporation that no defense should be offered." 483 A.2d at 1315. The plaintiff "was involved in each step of the process, changing roles as the circumstances warranted" and "the only persons aware of [the underlying] transactions were the three interested parties." *Id*. Thus, the Court of Special Appeals held that the plaintiff's own fraud "prevented the actual dispute from being submitted to the fact finder at all." *Id.* Similarly, the Court of Special Appeals held in *City of College Park v. Jenkins*, a case vacated on other grounds, that the plaintiff's manipulation of the rules of service of process to prevent "naming [the] appellant as a defendant and serving it with process" was "the type of fraud that [Rule 2-535(b)] contemplates because it actually prevented an adversarial trial." 819 A.2d 1129, 1138 (Md. App. 2003) (quotation omitted). Although Abbott was prevented from trying her case, the plaintiff bank in this case, unlike the plaintiffs in *Fleisher* and *Jenkins*, had nothing to do with her late discovery of the action for confessed judgment and cannot be held responsible for her inability to challenge it. Accordingly, even if this court had the authority to vacate Abbott's judgment—something the FDIC also vigorously disputes—there is no basis under Rule 2-535(b) to do so and her motion will be denied.

**II. Motion to Dismiss Abbott's Counter Claims**

The FDIC was appointed receiver by the Maryland Commissioner of Financial Regulation on April 27, 2012, under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), 12 U.S.C. § 1821(c). (Counter Compl., ECF No. 26, ¶ 1). "FIRREA was enacted in 1989 as an emergency measure to enable the [Resolution Trust Corporation or the FDIC] to resolve and liquidate expeditiously the hundreds of failed financial institutions throughout the country." *Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1035 (4th Cir. 1994) (citing H.R. Rep. 101-54(I), at 291, 307 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 103). Under the statutory scheme, "Congress required persons making claims against a failed financial institution or seeking to adjudicate rights against them to present their claims first to the receiver for resolution." *Id.* "[A] claimant must present his claim to the receiver for an initial determination of whether the claim should be allowed within 90 days of the publication of notice by the receiver[;] . . . [t]he receiver has 180 days after the claim is filed to determine whether to approve the claim." *Id.* (citing 12 U.S.C. § 1821(d)(3), (5)(A)(i)). If the receiver denies the claim, or makes no decision within the required time period, a claimant may file suit in federal court for *de novo* judicial review. *Id.* (citing § 1821(d)(6)(A), (7)(A)). If any claim is not presented to the receiver in time, "no court shall have jurisdiction over [it]." § 1821(d)(13)(D). This administrative exhaustion requirement is a "jurisdictional bar"; failing to adequately present a claim to the FDIC deprives the court of subject matter jurisdiction because "the elaborate administrative scheme established in [FIRREA] would be rendered meaningless through improvident judicial review." *Tillman*, 37 F.3d at 1036.

The FDIC has moved to dismiss all of the claims in Abbott's complaint, arguing that she failed to exhaust any of them. Abbott recognizes that FIRREA's exhaustion requirement governs

7

her claims, but argues that she did fully present them to the FDIC. The parties' dispute turns on whether the claim that Abbott presented to the FDIC within the required time period, (FDIC Mot. Dismiss, Ex. A ("Proof of Claim"), ECF No. 30-2), can be construed as encompassing some or all of the claims in her counter complaint. FIRREA does not define the term "claim" as used in the statute, but numerous courts that have addressed similar exhaustion disputes have held that a claim must contain "fair notice of the facts and legal theories on which a claimant seeks relief from the failed institution." *Brown Leasing Co. v. F.D.I.C.*, 833 F. Supp. 672, 675-76 (N.D. Ill. 1993); *see also, e.g.*, *Jahn v. F.D.I.C.*, 828 F. Supp. 2d 305, 316 (D.D.C. 2011). Where "a complaint alleges entirely new legal theories that are different than those reflected in the administrative proof of claim, the Court is without subject matter jurisdiction to consider the new causes of action." *Jahn*, 828 F. Supp. 2d at 317; *see also, e.g.*, *FirsTier Bank, Kimball, Neb. v. F.D.I.C.*, --- F. Supp. 2d ----, 2013 WL 1222067, at *7 (D. Colo. 2013); *cf. Branch v. F.D.I.C.*, 833 F. Supp. 56, 61-62 (D. Mass. 1993) (plaintiff had exhausted claims because "both his Complaints and Proofs of Claim . . . assert[ed] the same legal theories of recovery" and "same general set of facts").[3]

In her counter complaint, Abbott advances a number of legal theories. First, she asserts several breach of contract theories against the bank based on the agreements she entered into

---

[3] Abbott cites several cases from this circuit for the proposition that claims presented to the FDIC and to the court need only have both "assert[ed] a right to payment" to satisfy FIRREA's exhaustion requirements. (Def.'s Resp., Mot. Dismiss, ECF No. 32-1, at 2-3). The cited cases, however, do not contain any standard for assessing whether a claim presented to the court is sufficiently analogous to the claim presented to the FDIC to have satisfied the exhaustion requirement. Rather, the cases address situations where plaintiffs filed actions in district court without first presenting administrative claims at all, and, because the relief sought in the district court constituted a "claim" under FIRREA, the courts concluded that such claims should have first been presented to the receiver within the required time period. *See Elmco Properties, Inc. v. Second Nat. Fed. Sav. Ass'n*, 94 F.3d 914, 919 n.1, 920 (4th Cir. 1996); *Lafayette Fed. Credit Union v. Nat'l Credit Union Admin.*, 960 F. Supp. 999, 1003, 1003 n.8 (E.D. Va. 1997).

with the bank when she opened accounts there. She alleges that the bank breached provisions of such agreements related to (1) the unauthorized transfer of funds from her accounts, (2) the disclosure of her private information, (3) an implied covenant of good faith and fair dealing in the agreements, and (4) the bank's failure to investigate her allegations of fraud when they were first presented to it. (*See* Counter Compl. ¶¶ 92-103). Second, she alleges the bank was negligent in permitting forged documents to be used to transfer her assets and by failing to supervise its employees. (*See id.* ¶¶ 104-108, 114-118). Finally, she alleges conversion and respondeat superior liability. (*See id.* ¶¶ 109-113, 119-120). While she sought $222,077.99 in her proof of claim, (Proof of Claim, ECF No. 30-2), she seeks $250,000 in compensatory damages in her counter complaint, (Counter Compl. at 14-22).

Only Abbott's first breach of contract theory, related to the bank's unauthorized transfer of funds into and out of her account, was presented to the FDIC in the administrative process. In her proof of claim, Abbott presented a detailed recitation of all the facts related to her allegations of fraud by Robinson and his sister. She also provided a detailed account history to the FDIC, and alleged that the bank unlawfully exercised set-offs against her account and that Suzanne Richardson, a bank employee, "removed assets from the various savings accounts in the name of Karen Abbott, and made those funds available for her own use," and that Richardson also allowed Maurice Robinson "to withdraw or transfer funds from Karen Abbott's accounts." (Proof of Claim at 6). Thus, her proof of claim can fairly be read to contain a cause of action analogous to the first of her breach of contract theories: the bank breached its banking agreements with her by permitting the unauthorized transfer of funds from her accounts. On that theory, Abbott's counterclaim may proceed. Otherwise, her proof of claim does not contain or allude to any of the other legal theories advanced in her counter complaint. It does not contain

any claim for or reference to the disclosure of Abbott's nonpublic account information. Her proof of claim does not include any suggestion she is alleging negligence or negligent supervision, nor does it contain a standard of care or reference to any other legal theory.

Abbott argues that the FDIC is seeking to hold her to an impermissibly strict pleading standard, but, even liberally construing her proof of claim, her tangential references to her bank accounts and allegations of fraud by Robinson and his sister, an employee of the bank, did not provide the FDIC with fair notice of most of the causes of action in her counter complaint. *See FirsTier*, 2013 WL 1222067 at *6-8 (holding that plaintiff did not exhaust breach of contract claims other than those related to the specific contractual provision it expressly cited in its proof of claim); *cf. Branch*, 833 F. Supp. at 61 (plaintiff did exhaust claim, even where proof of claim omitted specific references to some challenged transactions, because the plaintiff sought "recovery under precisely the same legal causes of action" in both its complaint and proof of claim). Holding that Abbott's proof of claim was sufficient to have put the FDIC on notice of all of the legal theories in her counter complaint "would impose a burden on the FDIC to research the entire corpus of both federal and state law for any legal theory supported by each set of facts presented." *Brown Leasing*, 833 F. Supp. at 675-76. "Such an enterprise would impose indefensible costs on the FDIC and frustrate FIRREA's intended purpose of expeditiously and fairly resolving the majority of claims against failed institutions without protracted litigation." *Id.* at 676. Accordingly, this court has jurisdiction only to hear Abbott's counterclaim that the bank breached its banking agreements with her by permitting the unauthorized transfer of funds from her account. Her other counterclaims must be dismissed.[4]

---

[4] Because Abbott may only seek damages related to the unauthorized transfer of funds out of her account, only a portion of the $222,077.99 in damages she sought in her proof of claim can be attributed to such transfers. She may seek only the attributable amount on her remaining

10

### III. Motion for Joinder of Abbott's Third Party Complaint

Finally, Abbott seeks to join to this action several state law claims against Robinson, his sister, and other bank employees. Because her third party claims share the same common nucleus of operative fact with her breach of contract counterclaim against the bank (related to the fraudulent activity at the bank using her name), and because her counterclaim is based on the court's federal question jurisdiction under 12 U.S.C. § 1819(b)(2)(B), this court has jurisdiction over her third party complaint under 28 U.S.C. § 1367(a). Accordingly, Abbott's motion for joinder will be granted.

## CONCLUSION

For the reasons stated above, Abbott's motion to vacate the confessed judgment will be denied, the FDIC's motion to dismiss her counterclaims will be granted in part and denied in part, and Abbott's motion for joinder will be granted.

A separate Order follows.

September 11, 2013  /S/
Date  Catherine C. Blake
 United States District Judge

---

counterclaim against the FDIC as receiver, which, according to her proof of claim, appears to be $97,785.32. (*See* Proof of Claim at 6).